IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

BRAD W. KELLEY                                                                                   PLAINTIFF

V.                          Civil No. 2:22-cv-02167-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,
Social Security Administration                                                              DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Brad Kelley, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (the "Commissioner") denying his claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. § 1382.  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  *See* 42 U.S.C. § 405(g).

### I.        Procedural Background

Plaintiff filed his application for SSI on May 20, 2020, alleging disability since December 18, 2018, due to traumatic brain injury ("TBI"), post-operative hematoma, seizures, a torn ACL in the left knee, and post-surgical impairment of the right hand.  (ECF No. 10, pp. 56, 75, 180-186, 202, 225-226).  An administrative hearing was held on June 10, 2021.  (*Id*. at 35-53).  Plaintiff was present and represented by counsel.

Born on July 23, 1983, Plaintiff was 36 years old on his alleged onset date and possessed a limited education.[1]  (ECF No. 10, p. 26, 302).  Although the Plaintiff had work experience as a

---

[1] The Plaintiff advised Dr. Patricia Walz that he completed the 9th or 10th grade but was ultimately kicked out for fighting.  (ECF No. 10, p. 302).

dump truck driver, forklift driver, and lawncare worker, the ALJ found he had no qualifying past relevant work ("PRW"). (*Id*. at 26, 268). He continued to work after his application date, though said work did not rise to the level of substantial gainful activity. (*Id*. at 19).

On September 20, 2021, Administrative Law Judge ("ALJ"), Bill Jones, identified Plaintiff's seizure disorder status post TBI with craniotomy, persistent depressive disorder, intermittent explosive disorder, and antisocial personality disorder as severe impairments, but he concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (ECF No. 10, pp. 19-20). Despite his impairments, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform light work with no exposure to hazards, such as dangerous machinery and unprotected heights; and where the interpersonal contact is incidental to the work performed; the complexity of the tasks is learned and performed by rote, with few variables and little judgment; and the supervision required is simple, direct, and concrete. (*Id*. at 22). With the assistance of a vocational expert ("VE"), the ALJ ultimately decided there were jobs that exist in significant numbers in the national economy that the Plaintiff could perform, including cleaner and parts inspector. (*Id*. at 27).

The Appeals Council denied Plaintiff's request for review on August 22, 2022. (ECF No., 10, pp. 6-11). Plaintiff subsequently filed this action on September 25, 2022. (ECF No. 2). Both parties have filed appeal briefs (ECF Nos. 13, 15), and the matter is ready for Report and Recommendation.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial

evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id.*

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past

relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. 20 C.F.R. § 416.920(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in the light of his RFC if the final stage of the analysis is reached. 20 C.F.R. § 416.920(a)(4)(v).

### III. Relevant Medical Evidence

At the outset, we note that the relevant period is limited in SSI cases. *See* 20 C.F.R. § 416.335; *Cruse v. Bowen*, 867 F.2d 1183, 1185 (8th Cir. 1989) (using SSI application date to mark the beginning of the relevant period); *Myers v. Colvin*, 721 F.3d 521, 526 (8th Cir. 2013) (using the date of the ALJ's decision on the SSI claim to mark the end of the relevant period). Thus, the relevant period extends from May 20, 2020, the date the Plaintiff filed his SSI application, through September 20, 2021, the date of the ALJ's decision. Although the record is over 4,500 pages in length, many of these records predate the relevant period. Accordingly, evidence predating his application will only be used to elucidate his condition during the relevant period. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006) (holding records and medical opinions dated outside the relevant period can only be used in "helping to elucidate a medical condition during the time for which benefits might be rewarded").

The Plaintiff's relevant history began in December 2018, when his motorcycle struck another vehicle broadside at 50 miles per hour. (ECF No. 10, pp. 575-931; ECF No. 10-1, pp. 1-3, 5-7, 9-39, 47-50, 53-66, 68-98, 100-112, 194-201, 204-207, 221-226; ECF No. 10-2, pp. 1-2725; ECF No. 10-3, pp. 149-153, 291-525, 532-620). He was ejected from the motorcycle and, to his own detriment, was not wearing a helmet. As a result, he suffered a closed head TBI, requiring bilateral temporal craniotomies to evacuate hematomas. These injuries affected both his personality and his ability to manage his anger. The Plaintiff also suffered a fracture of the base

4

of the fourth metacarpal bone with partial degloving and a partial tendon laceration to the right hand, necessitating reconstructive surgery. He was released home on January 9, 2019, with home health and outpatient occupational therapy. (ECF No. 10-3, pp. 1-79). Thereafter, the Plaintiff reported residual symptoms to include headaches, dizziness, memory loss, and tendon adhesions. (ECF No. 10-1, pp. 174-177, 185-191; ECF No. 10-3, pp. 283-287, 713).

In July 2019, Dr. Patricia Walz conducted a consultative mental evaluation of the Plaintiff. (ECF No. 10, pp. 301-306). Despite a history of depression dating back to childhood, the Plaintiff reported no current psychotropic medications or formal mental health treatment. Further, he admitted to a criminal history[2] and a lengthy history of alcohol abuse, stating that he consumed alcohol until his accident. He also used marijuana on a weekly basis, indicating that it calmed him and squelched his anger. Dr. Walz diagnosed persistent depressive disorder exacerbated by the accident, probable intermittent explosive disorder, antisocial personality disorder, cannabis use disorder, alcohol use disorder reportedly in sustained remission, and rule out major cognitive disorder due to his TBI. She assessed the Plaintiff with borderline to low average intellectual functioning and opined that his social skills would be impaired by his irritability and angry outbursts. Dr. Walz also indicated that his attention and concentration were impaired, and his thought processes and speed of information were quite slow. Although he reported memory issues, he was noted to be a good historian and did fairly well on the memory portion of the mental status exam. Accordingly, she concluded the Plaintiff could only manage a simple budget without assistance.

Later that month, Dr. Chester Carlson conducted a general physician exam. (ECF No. 10-1, pp. 208-220; ECF No. 10-3, pp. 281-282, 529-530). The exam revealed decreased dorsiflexion

---

[2] The Plaintiff has been to prison on three occasions, the first due to possession of marijuana and the other two related to probation violations. (ECF No. 10, pp. 301-306).

and palmar flexion in the right wrist; restricted proximal interphalangeal and metacarpophalangeal joint motion in the right hand; decreased flexion in the right hip; decreased flexion in the right knee; and a reduced range of motion in the cervical spine. There was, however, no muscle weakness, atrophy, sensory abnormalities, or gait/coordination abnormalities noted. And an x-ray of the right hand revealed a healed fracture of the right metacarpal. Dr. Carlson diagnosed an injury to the right hand secondary to a motorcycle accident. He assessed moderate to severe impairment of his ability to grip, carry, lift, and write with the right hand. The doctor noted that the Plaintiff could hold a pen and write and touch fingers to palm with his left hand only; he could not walk on heel and toes secondary to a right leg injury; he could not squat/arise from a squatting position secondary to his right knee; and he exhibited 50% normal grip strength in the right hand (unable to completely close hand) but full strength in left hand.

Due to tendon adhesions in the fingers of the right hand, orthopedic surgeon, Dr. Eric Heim, performed tenolysis of the extensor tendon of the right ring and middle fingers in August 2019. (ECF No. 10-1, pp. 208-220; ECF No. 10-3, pp. 281-282, 529-530). Three days later, the Plaintiff was transported to the emergency room ("ER") after experiencing a seizure lasting two to three minutes. (ECF No. 10, pp. 336-349, 469-472, 491-494, 510-511; ECF No. 10-3, pp. 82-148, 154-157). A CT scan of the head without contrast revealed peripheral encephalomalacia in the lateral left temporal lobe subadjacent to the craniotomy defect. There was, however, no acute intracranial abnormality. As such, the Plaintiff was given seizure precautions and advised to follow-up with neurology.

On September 3, 2019, Dr. Heim indicated he was very pleased with the Plaintiff's progress. (ECF No. 10-3, pp. 711-712). He advised him to resume therapy and prescribed pain medication. The following month, Plaintiff's right hand continued to show improvement. (ECF

No. 10, pp. 321-325, 396-398; ECF No. 10-3, pp. 631-634, 706-709).  He could make a full composite fist and had less tendon-skin adhesions and pulling.  Dr. Heim advised him to continue motion and hook exercises and scar massages, prescribed Hydrocodone, and recommended he allow at least six months for full medical improvement.

The Plaintiff was again transported to the ER in late November 2019 for complaints of dizziness, headache, and memory loss.  (ECF No. 10, pp. 390-395, 407-417, 429-435, 440-441; ECF No. 10-3, pp. 275-280, 526-528).  He admitted that he had not followed up with neurology as he had been directed because he did not have the money to pay his co-pay.  Following a normal CT scan of the head, the ER doctor diagnosed dizziness with a history of a head injury.  He prescribed Hydrocodone and Meclizine.

On January 1, 2020, the Plaintiff experienced another seizure, requiring transport via emergency medical services.  (ECF No. 10, pp. 350-360, 460-465, 476-478; ECF No. 10-3, pp. 158-161).  During the episode, he fell and struck his head on the corner of the door frame, resulting in a laceration to his scalp.  Although no significant changes were noted on a CT scan of his head, the doctor diagnosed a seizure and prescribed Keppra.  An EEG dated January 15, 2020, was normal.  (ECF No. 10, pp. 381-383, 456-457, 474-475, 500-503).  Unfortunately, the Plaintiff only took the Keppra for a few days before determining he did not like the way it made him feel and discontinuing the medication.  The doctor prescribed a Keppra load and directed the Plaintiff to restart the medication at home.

He suffered a second seizure in February 2020.  (ECF No. 10-3, pp. 162-270).  Plaintiff presented in the ER with a headache, fatigue, nausea, dizziness, and an altered level of consciousness.  Following an unchanged CT scan, the doctor diagnosed recurrent generalized seizure and prescribed Hydrocodone, Ondansetron, Naproxen, and Keppra.

The Plaintiff established care with Dr. Ronald Schlabach on February 12, 2020, and requested that he complete an assessment for disability. (ECF No. 10, pp. 327-331, 452-456). He reported chronic right-sided head pain throughout the day with a history of seizure activity. Although he had been noncompliant with Keppra in the past, the Plaintiff indicated he was taking the medication as directed. He was, however, now out of Hydrocodone and Ondansetron. An exam revealed appropriate motion in the extremities, no obvious peripheral sensory or motor deficits, good strength in the proximal and distal musculature of the extremities, and a normal gait. He was able to hear finger rubs in the left ear but not in the right. Additionally, the Plaintiff was alert and fully oriented with a somewhat flat affect, normal speech, and good eye contact. Dr. Schlabach advised him to continue the Keppra and to keep his appointment with neurology in May. He also indicated the Plaintiff could continue using medical marijuana, as it decreased his overall headache intensity and helped decrease his anxiety. Although the doctor refused to complete an RFC assessment, he did indicate it would be logical to say the Plaintiff should not operate motorized tools. He was of the opinion, however, that someone could drive Plaintiff to work, and that he should be able to do manual labor activity with other tools.

During an April follow-up phone call with Dr. Heim's office, the Plaintiff reported doing well with no pain and no problems. (ECF No. 10, p. 390).

The Plaintiff saw Timothy Booker, physician's assistant to Dr. William Knubley at Mercy Neurology, on May 5, 2020. (ECF No. 10, pp. 372-380, 445-452). Plaintiff claimed to have had a fourth seizure a couple of months prior, but he did not seek out medical attention for it. At this time, a physical exam revealed full motor strength, a normal gait, no sensation abnormalities, and a normal neurological evaluation. PA Booker noted him to be stable on Keppra but stressed the importance of taking it faithfully. He also encouraged good sleep hygiene, abstinence from

alcohol, and the effective management of stress as these were all ways to increase his seizure threshold.  The Plaintiff indicated that he was no longer drinking or using marijuana.

On September 29, 2020, PA Booker completed a treating physician's seizure report.  (ECF No. 10, pp. 528-529, 545-546).  He indicated that he had treated the Plaintiff for convulsive, generalized seizures since May 2020.  Since that time, the Plaintiff had reported two seizures.

Dr. James Hazlewood examined the record on October 20, 2020, concluding the Plaintiff could perform light work with no exposure to hazards such as machinery and heights.  (ECF No. 10, pp. 65-67).  That same day, Dr. Marilyn Jordan completed a psychiatric review technique form and mental RFC, concluding the Plaintiff would have moderate limitations in the following areas: carrying out detailed instructions; maintaining attention and concentration for extended periods; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number of rest periods; interacting appropriately with the general public; accepting instructions and responding appropriately to criticism; and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (ECF No. 10, pp. 62-63, 67-69).

On November 5, 2020, the Plaintiff advised PA Booker that his last seizure occurred in March, but he raised a concern regarding a new onset of paroxysmal vertigo with associated nausea.  (ECF No. 10, pp. 539-545).  These episodes occurred twice per week and lasted 45 minutes.  He also reported chronic tinnitus in the right ear following his TBI.  An exam revealed the Plaintiff to be pleasant and cooperative with no apparent distress, a normal mental status exam, intact memory, normal motor function, and normal coordination and gait.  Vestibular testing revealed a slightly sharpened Romberg, past pointing, and Quik's to the right.  PA Booker referred him to an otolaryngologist for the evaluation of his spells, as he could not ascertain whether they

were an atypical form of Meniere's or purulent fistula secondary to head trauma.  He noted, however, the Plaintiff's seizure disorder was stable on Keppra.

Two weeks later, Dr. Rachel Morrisey conducted an independent review of the record and concluded the Plaintiff's mental impairments would moderately limit his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (ECF No. 10, pp. 83-86, 92-95).  Later that month, Dr. Cheryl Snyder completed a physical RFC assessment concluding the Plaintiff could perform light work with no exposure to hazards such as machinery and/or heights.  (*Id*. at 88-92).

Plaintiff returned to PA Booker on March 9, 2021.  (ECF No. 10, p. 559-567).  Although he reported one seizure the previous month, despite taking the Keppra faithfully, his main concern was his anger issues.  The Plaintiff reported waking up angry, with little things seeming to set him off.  His fiancé indicated that this was a problem prior to his head injury, but it had worsened since the injury.  Noting an unchanged exam, PA Booker increased Plaintiff's Keppra dosage, added Lamictal, and referred the Plaintiff for psychiatric assistance regarding his mood disorder.  He also referred him back to Dr. Schlabach for the completion of his RFC assessment.

On May 5, 2021, the Plaintiff was evaluated by otologist, Dr. David Walker, for complaints of hearing difficulty and ringing in the right ear.  (ECF No. 10-3, pp. 651-694).  This had reportedly begun approximately one year after his head injury.  The Plaintiff reported that his hearing had

improved mildly, as had his tinnitus, but his dizzy spells remained intermittent. Riding in a car, looking down, and looking back up exacerbated his symptoms, making him feel drunk. Antivert was said to be helpful, as was marijuana. An audiogram revealed right sensorineural hearing loss and borderline hearing loss in the left ear. Dr. Walker ultimately concluded that the Plaintiff's dizziness was multifactorial, related to his lower extremity paresthesias, his TBI, and the side effects of the anti-convulsant medications to prevent seizures.

## IV. Discussion

Plaintiff raises four issues on appeal: (1) whether the ALJ fully and fairly developed the record; (2) whether the ALJ erred at Step Two of the sequential evaluation; (3) whether the ALJ properly considered the Plaintiff's subjective complaints; and (4) whether the RFC determination is supported by substantial evidence.

### A. Development of the Record

In his first issue, the Plaintiff contends that the ALJ failed to develop the record fully and fairly by obtaining additional RFC assessments from a treating and/or examining source. While the ALJ does owe a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts, the ALJ is only required to develop a reasonably complete record. *See Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004); *see also Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (citing *Clark v. Shalala*, 28 F.3d 828, 830-831 (8th Cir. 1994)). An ALJ need not recontact a treating or consulting physician unless a critical issue is undeveloped, and an ALJ is not required to order medical examinations and tests unless the medical records presented do not provide sufficient evidence upon which a disability determination can be made. *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted). There is no requirement that the ALJ's RFC finding be supported

by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Instead, the RFC is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records. *See Perks v. Astrue*, 687 F.3d 1086, 1092-1093 (8th Cir. 2012) (holding RFC determination is reserved to Commissioner and based on the evidence of record). The ALJ must rely on all the relevant medical and non-medical evidence, not just the medical opinions, in forming the RFC. *See Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016); 20 C.F.R. § 416.945(a)(3). Thus, while there must be some evidence of the Plaintiff's ability to function in the workplace, every aspect of the RFC is not required to be supported by a specific medical opinion. *Twyford v. Comm'r, Soc. Sec. Admin.,* 929 F.3d 512, 518 (8th Cir. 2019) (quoting *Hensley*, 829 F.3d at 932).

In the present case, we note that the record contains a plethora of medical evidence, including treatment notes from the Plaintiff's treating physicians and specialists; operative reports; hospitalization notes; occupational therapy notes; emergency room records; imaging results; seizure statements from the Plaintiff and his friends/family; a treating physician's seizure report prepared by PA Booker; and physical and mental RFC assessments from four agency physicians. We find this evidence sufficient to support the ALJ's conclusion that the Plaintiff was not disabled. *Swink v. Saul*, 931 F.3d 765, 770 (8th Cir. 2019) (holding ALJ permitted to issue decision without obtaining additional medical evidence where other evidence in record provided sufficient basis for decision).

Plaintiff's argument that the ALJ must adopt the opinions of the agency physicians in toto, is also misplaced. *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) ("[T]he ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians."). An ALJ is free to accept only those portions of the assessments he finds

12

to be supported by the overall record. *See Webster v. Kijakazi*, 19 F.4th 715, 719 (5th Cir. 2021) (while ALJ did not adopt opinion verbatim which limited claimant to minimal interaction with others, ALJ incorporated opinion by limiting claimant to occasional public contact, and RFC assessment was supported by substantial evidence); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (substantial evidence supported RFC determination based on medical records, consultant and other medical opinions, and some aspects of claimant's testimony). Further, an ALJ may also rely on the opinions of Agency physicians if he "sufficiently explain[s] the inconsistencies" in the treating physicians' opinions that led the ALJ to "give greater weight to the consultative opinion." *Kraus v. Saul*, 988 F.3d 1019, 1025-1026 (8th Cir. 2021). Because the ALJ did so in this case, no error was committed.

Further, the Plaintiff has also failed to put forth additional functional assessments to establish prejudice resulting from the ALJ's failure to order additional RFCs. *See Haley v. Massanari*, 258 F.3d 742, 750 (8th Cir. 2001) (quoting *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995) (holding reversal "due to failure to develop the record is only warranted where such failure is unfair or prejudicial")). Therefore, reversal is not required.

## B.  Step Two Findings

In his second argument, the Plaintiff insists that the ALJ failed to consider his right ear deafness, severe hand trauma, PTSD, and developmental/learning disability at Step Two. At Step Two, a claimant has the burden of providing evidence of functional limitations in support of their contention of disability. *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id.* (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987)); 20 C.F.R. § 416.922(a). "If the impairment would have no more than a minimal

effect on the claimant's ability to work, then it does not satisfy the requirement of step two." *Id*. (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)). Failure to find a particular impairment to be severe at Step Two, however, is not a reversible error unless the ALJ ends his analysis at Step Two. *See Bowen*, 482 U.S. at 156-157 ("failure to find a particular impairment severe at step two is not reversible error as long as the ALJ finds that at least one other impairment is severe"); *Valley v. Astrue*, 2011 WL 5999260, at *2 (E.D. Ark. Nov. 29, 2011) (step two error harmless where ALJ proceeded past step two and considered all of claimant's impairments).

As previously mentioned, the ALJ concluded that the Plaintiff had severe impairments, namely seizure disorder status post TBI with craniotomy, persistent depressive disorder, intermittent explosive disorder, and antisocial personality disorder as severe impairments. (ECF No. 10, pp. 19-20). He then proceeded through the sequential process, concluding that the Plaintiff was not disabled because the combination of his impairments, both severe and non-severe, do not prevent him from performing work that exists in significant numbers in the national economy. As such, any error at Step Two is harmless.

### C.     Subjective Complaints Analysis

The Plaintiff also asserts that the ALJ failed to properly consider his subjective complaints. Aside from considering the findings of the treating and examining physicians, he maintains that the ALJ failed to identify any inconsistencies in the record.

An ALJ is required to consider all the evidence relating to a claimant's subjective complaints, including: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitation and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). In so doing, the ALJ must also consider the claimant's prior work record, observations

made by third parties, and the opinions of treating and examining physicians. *Id*. The Eighth Circuit has held, however, that an ALJ is not required to discuss each *Polaski* factor methodically. *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005); *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996). The ALJ's analysis will be accepted if the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000); *see also Brown*, 87 F.3d at 966.

While the ALJ may not discount the Plaintiff's subjective complaints solely because the medical evidence fails to support them, he may disbelieve subjective reports that are inherently inconsistent with other evidence. *Id*.; *see also Wright v. Colvin*, 789 F.3d 847, 853 (8th Cir. 2015) (citing *Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007) (quotation and citation omitted)). Thus, when, as here, the ALJ considers the relevant factors and discredits the Plaintiff's complaints for good reason, the decision will be upheld. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001).

The ALJ properly considered the Plaintiff's subjective complaints and testimony, as well as the relevant medical evidence. (ECF No. 10, p. 23). The Plaintiff indicated that he stopped working in December 2018 after experiencing TBI with residuals to include seizures and chronic right sided head pain. Although the seizures appeared without warning, they only occurred once every four or five months. (*Id*. at 42-43). And, as the ALJ documented, he only experienced four seizures between September 2019 and September 2020. PA Booker even noted his seizure disorder to be stable on medication. (ECF No. 10, pp. 372-380, 445-452, 539-545). *See Patrick v. Barnhart*, 323 F.3d 592, 596 (8th Cir. 2003) (holding if an impairment can be controlled by treatment or medication, it cannot be considered disabling). And although he did report some headaches to his physicians, they were not of the same severity and/or intensity he reported at the

hearing. (*Id*. at 43-44, 49). Further, although he did report some use of marijuana to his physicians, the Plaintiff testified that he had not been prescribed any pain medication to treat his headaches.

The Plaintiff also experienced some residual pain and stiffness in his right hand/wrist following the accident in 2018. Acknowledging Dr. Carlson's July 2019 documentation of 50% normal grip strength in the right hand with limitations holding a pen and writing and touching fingers to palm, the ALJ properly concluded that the Plaintiff's ability to use said hand improved after Dr. Heim performed tenolysis of the extensor tendon of the right ring and middle fingers in August 2019. (ECF No. 10, pp. 308-312, 394-404, 425-428; ECF No. 10-1, pp. 208-220; ECF No. 10-3, pp. 281-282, 529-530). By October 2019, he could make a full fist, although he remained sore. (ECF No. 10, pp. 321-325, 396-398; ECF No. 10-3, pp. 631-634, 706-709). Further, during a follow-up telephone call in April 2020, the Plaintiff reported doing well with no pain and no problems. (ECF No. 10, p. 390).

In addition, the record indicates that the Plaintiff suffered from some dizzy spells, sensorineural hearing loss in the right ear, and borderline hearing loss in the left ear. Interestingly, these symptoms did not begin until approximately one year after his TBI. But, regardless of the timing, Plaintiff admitted that his vertigo was responsive to Antivert/Meclizine. *See Patrick*, 323 at 596. Further, despite his hearing loss, there is no evidence in the record to indicate that he was unable to hear his physicians and/or treatment providers and did not require his attorney and/or the ALJ to repeat questions at the administrative hearing. (*Id*. at 36-53). *See Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) (holding that fact that plaintiff did not have trouble hearing or understanding the ALJ weighed against claim for disability). And no intervention was prescribed. Thus, it seems clear that the Plaintiff's hearing impairment did not significantly affect his ability to function in society.

Mentally, the Plaintiff reported difficulties with anger management, focus, and memory. We note, however, that despite his alleged memory issues, mental status exams fail to support his assertion. Dr. Walz even found him to be a good historian with no significant memory deficits apparent on examination. (ECF No. 10, pp. 301-306). She concluded that his attention and concentration were impaired, and his thought processes and speed of information were slow. Additionally, despite his purported anger issues, he reportedly got along well with others, including authority figures. (*Id.* at 227-234). And the Plaintiff reported no history of being laid off or fired from a job due to his alleged anger or irritability. Therefore, while we do not doubt that he experiences a level of anger and frustration, it does not appear from the record to significantly affect his ability to interact with others.

The ALJ also acknowledged Plaintiff's self-reported activities, which were said to include watching television, caring for his emotional support dog, cooking, performing light house chores, maintaining relationships, socializing with friends and family, shopping for groceries, and managing his personal care. (ECF No. 10, pp. 227-234). This evidence, coupled with the assessments of Drs. Hazlewood, Snyder, Jordan, and Morrisey, indicate that the Plaintiff was much less limited, both physically and mentally, than he has alleged.

Accordingly, we find that the ALJ properly considered the Plaintiff's subjective complaints and discussed the inconsistencies contained in the record. His decision was not based solely on the absence of objective medical evidence to support the Plaintiff's complaints.

### D. RFC Determination

In his final argument, the Plaintiff avers that the ALJ's RFC determination is not supported by substantial evidence. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 416.945. A disability claimant has the burden of establishing his RFC. *Vossen*, 612 F.

3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

The ALJ considered Dr. Carlson's July 2019 findings, but as previously mentioned, found that the overall record showed improvement in the Plaintiff's functional use of his right hand/wrist following surgery in August 2019. (ECF No. 10-1, pp. 208-220; ECF No. 10-3, pp. 281-282, 529-530). Thus, he concluded that Dr. Carlson's opinion was not persuasive.

The ALJ also found Dr. Schlabach's opinion that the Plaintiff should not be operating a motor vehicle or motorized tools but should be able to do manual labor activity with other tools to be somewhat persuasive. (ECF No. 10, pp. 327-331, 452-456). The ALJ noted, however, Plaintiff's largely unremarkable neurological workup as weighing against Dr. Schlabach's limited opinion.

Additionally, the ALJ discussed the opinions of Drs. Hazlewood and Snyder, concluding that the Plaintiff could perform light work with no exposure to hazards such as machinery and/or heights. (ECF No. 10, pp. 65-67, 88-92). He ultimately concluded that these assessments were supported by a thorough review and summary of the Plaintiff's medical records, including the

records detailing his treatment for TBI and seizures and the absence of medical evidence to show neurological and physical deficits.

From a mental perspective, the ALJ found Dr. Walz's conclusions to be largely unpersuasive, as they were vague, did not point to any specific work limitations, and were not supported by the overall record. He noted the consistent mental status examinations showing no significant deficits and the absence of both psychotropic medication and formal mental health treatment. *See Kirby*, 500 F.3d at 709 (holding absence of formal treatment is a significant consideration when evaluating Plaintiff's allegations of disability due to a mental impairment).

As for Drs. Jordan and Morrisey, the ALJ found their opinions to be both persuasive and supported by the overall record. They concluded the Plaintiff could perform interpersonal contact that is incidental to the work performed, where the complexity of the tasks is learned and performed by rote with few variables, little judgment, and the supervision required is simple, direct, and concrete. We agree that these assessments are consistent with a diagnosis of mood disorder with no evidence of suicidal ideation, psychosis, paranoia, or hallucinations and are supported by Plaintiff's own statements regarding his interaction with others.

Thus, while the Plaintiff bears the burden of producing evidence to establish his RFC, the RFC is ultimately a determination reserved solely for the Commissioner. *See Vossen*, 612 F. 3d at 1016; *see also Perks*, 687 F.3d at 1092-1093. It need not track or be based on any particular medical opinion. *See Twyford*, 929 F.3d at 518. Accordingly, we find substantial support in the record for the ALJ's RFC determination.

## VI.    Conclusion

For the reasons and upon the authorities discussed above, it is recommended that the ALJ's decision be affirmed, and that the Plaintiff's Complaint (ECF No. 2) be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 27th day of November 2023.

/s/ *Mark E. Ford*
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE